**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTINA W.,[1]<br><br>Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No. 25-CV-2051-CJW-KEM<br><br>**REPORT AND RECOMMENDATION** |

---

Plaintiff Christina W. seeks judicial review of a final decision of the Commissioner of Social Security denying her application for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Plaintiff argues that the administrative law judge (ALJ), Michael Lee Larner, should have evaluated her migraines under Listing 11.02B and included a limitation related to light sensitivity and use of a walker in her residual functional capacity (RFC). She also argues the ALJ erred in relying on obsolete jobs based on national numbers only, with no evidence of regional availability. I recommend **affirming** the ALJ's decision.

## ***I. BACKGROUND***

When Plaintiff was 18 (in 2010), she received disability benefits based on intellectual disability and a mood disorder. *See* AR 109-20.[2] In 2016, her benefits ended based on a finding of medical improvement. *Id.* She had gone from living in a group

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] "AR" refers to the administrative record below (Doc. 13).

home and performing supervised work to living independently and working as a telemarketer for three to four months, a job she quit because of pregnancy and choosing to be a stay-at-home mom. *Id.* She appealed the termination of benefits, but an ALJ upheld the finding in a written decision issued on May 16, 2018. *Id.*

Plaintiff filed a prior application for SSI benefits in October 2018, which an ALJ denied in March 2020 after a hearing. AR 129-37. The ALJ found she suffered from severe impairments of obesity, headaches, anxiety, and depression (the ALJ recognized an IQ score of 67 but found no other evidence of intellectual disability). *Id.* The ALJ found that despite her impairments, she was not so limited that she could not work.

Plaintiff filed a prior application for SSI benefits in August 2020, which was denied on initial review in June 2021. AR 143. Plaintiff did not appeal.

Plaintiff filed the current application for SSI benefits on January 18, 2022. AR 143. She alleged disability since birth based on chronic pain, nerve pain, sleep apnea, anxiety, depression, bipolar disorder, and anti-social behavior (not migraines). *Id.*

Treatment records reflect a few complaints of back pain and migraines leading up to this application. Plaintiff reported low back pain during a disability examination in October 2016. AR 983-84. In September 2017, she complained of back pain radiating down her left leg to her primary care provider, Dr. Mordechai Lederman, DO, and he told her to try physical therapy; she attended one session. AR 921-26. She complained of frequent headaches and all-over achiness and fatigue to Dr. Lederman in November 2017; he suggested her daily Tylenol and ibuprofen use could be causing "rebound" headaches and prescribed amitriptyline, a migraine preventative. AR 915, 917-19. In late December 2017, Plaintiff called Dr. Lederman's office and reported "pelvic pain, headaches all day, and back pain"; Dr. Lederman indicated he spoke to her and answered her questions at her child's appointment. AR 909-10. In June 2018, Plaintiff called Dr. Lederman's office to report migraines three times a day with blurred vision lasting one

to three hours; she ultimately went to the ER[3] based on her complaints of dizziness, "blacking out," and migraines two to three times a week, and was discharged with a medication for vertigo. AR 902-06. In October 2018, Plaintiff called Dr. Lederman's office to report "daily migraines" "a dozen times a day," worsened with light (but not loud noises). AR 900. At her appointment the next week, she told Dr. Lederman that she suffered "frequent and daily headaches," but she said if she did not drink Mountain Dew and Pepsi, she did not get a headache; Dr. Lederman told her to drink water instead of soda. AR 894-99. In February 2019, while pregnant, Plaintiff called Dr. Lederman's office to complain about headaches from the time she woke up at 8:30 a.m. to 2 p.m.; Dr. Lederman advised her to continue taking Tylenol and drink plenty of water. AR 879. In late February 2020, she called Dr. Lederman's office to report muscle spasms in her back and legs; the nurses noted they made an appointment for her, but no treatment note documenting any such appointment appears in the record (the appointment was perhaps canceled due to the coronavirus pandemic). AR 807. In late March 2020, she presented to the ER with complaints of a headache and sore throat, and her headache resolved with medications. AR 803-07. In May 2020, she requested blood work from Dr. Lederman based on her "symptoms of fatigue, migraine, hot flashes, and dizziness"; her labs were normal. AR 802-03. In August 2020, at an appointment with Dr. Lederman's office related to dizziness, Plaintiff reported suffering "migraines at times." AR 773.

Throughout 2021, Plaintiff had appointments with Dr. Lederman related to her pregnancy, ultimately delivering a healthy baby in early October 2021. AR 548-92. Treatment notes do not reflect that she complained of back pain or headaches at these appointments, and on one occasion, Dr. Lederman noted normal gait and normal strength and sensation in her extremities. AR 586.

[3] Emergency room.

On December 20, 2021, Plaintiff had an appointment scheduled with Dr. Lederman for an issue that had ultimately resolved itself. AR 532-33. She said she kept the appointment, however, to address her low back pain, with the right side worse than the left. On objective examination, Dr. Lederman noted "she react[ed] with exaggerated tenderness to palpation about the apex of her natural lumbar lordosis." He also noted a past lumbar spine x-ray showed no "more than minimal scoliosis." *See also* AR 509 (normal spine x-ray in June 2020). Dr. Lederman prescribed tramadol (an opioid).

On December 27, 2021, Plaintiff called Dr. Lederman's office requesting an anxiety medication (she had stopped her normal mental-health medications during pregnancy) and reporting "migraines from hell." AR 533.

On January 4, 2022, Plaintiff had a postpartum follow-up appointment with Dr. Lederman. AR 528-32. She reported continued mid- to low-back pain (the treatment note does not reflect that she complained of migraines). On objective examination, Dr. Lederman noted antalgic gait, symmetric strength in the extremities, and tenderness to palpation in the low back. He referred Plaintiff to physical therapy and ordered labs to check for rheumatoid factor.

Throughout January and early February 2022, Plaintiff called Dr. Lederman's office to report continued pain. On January 6, she reported back pain even with the use of tramadol. AR 528. Dr. Lederman recommended physical therapy to build strength. Plaintiff again called on January 19, reporting "a lot of pain everywhere" that made it difficult to climb stairs, and Dr. Lederman ordered additional labs. AR 527. Plaintiff's labs were normal, and Dr. Lederman again recommended physical therapy and exercise. AR 525-26. On February 2, Plaintiff called Dr. Lederman's office complaining of "ongoing bilateral hip and low back pain." AR 525. She wondered if she needed any additional testing, and Dr. Lederman responded that "[t]esting is not the answer[, g]etting active, moving, exercising is." On February 9, Plaintiff called Dr. Lederman's office reporting continued "generalized pain." AR 524. She said the pain was constant, she

sometimes felt sharp pain in her arms or feet, and her legs felt stiff. She said she was taking tramadol and had her first physical therapy on the 11th, but she ultimately did not show up for this appointment, later reporting car troubles and "using yoga exercises from [Y]ouTube."

On February 15, 2022, Plaintiff met with Dr. Lederman. AR 522-24. She reported taking 50 milligrams of tramadol three times a day and still experiencing pain "all over." Dr. Lederman noted normal labs and x-rays and explained that he "believe[d] her pain [wa]s secondary to her marked extended sedentary lifestyle and that [he] recommend[ed] exercise." Dr. Lederman changed her mental-health medication from sertraline to duloxetine (Cymbalta) in the hopes that it would provide pain relief.

On April 1, 2022, Plaintiff completed a function report for the Social Security Administration. AR 407-14. She reported living with her four young children,[4] significant other, and her significant other's brother. She said she suffered from chronic pain in her back, hips, legs, and feet, and nerve pain in her extremities. In a typical day, she reported "help[ing] as much as [she could]" until 11 a.m., then going "back to bed" until 7 p.m., then being awake until bedtime at 10 p.m. She denied preparing meals, doing house chores or yard work, or participating in social activities, although she did help care for her children (feeding, bathing, and dressing them). She indicated she shopped for groceries and "house stuff" once a month; later, when asked where she went on a monthly basis, she responded stores for food and household essentials, but her significant other drove and shopped while she waited in the vehicle. She listed her hobbies as "my kids [and] sleeping." She reported limitations with almost all work functioning, stating that walking, standing, and sitting hurt her back, hips, and legs and that she did not know how long she could walk before needing to rest. She did not check boxes indicating she used an assistive device to walk. Her significant other completed a

[4] *See also* AR 1870.

function report around the same time similarly indicating she did not do much other than sleep, watch television, and care for the kids. AR 415-21.

On April 7, Plaintiff called Dr. Lederman's office continuing to report "all over body pain, especially in neck and hips," and requesting "something stronger" than tramadol. AR 689. Dr. Lederman stated without physical therapy, he had nothing more to offer. Plaintiff responded that she did not think physical therapy would help.

On April 12, 2022, Plaintiff called Dr. Lederman's office complaining of "getting migraines again lately," a long-term problem. AR 688. She reported past usage of amitriptyline at bedtime but wanted a medication she could take during the day as well. Dr. Lederman referred her to a neurologist and prescribed amitriptyline in the meantime.

On April 25, 2022, Plaintiff met with neurologist Brian O'Shaughnessy, MD. AR 661-65. She complained of chronic pain from her back down to her legs and feet. She reported suffering from daily headaches for "a number of years" and recently restarting amitriptyline, a medication she had taken previously. Symptoms included blurred vision at times, light and noise sensitivity, and nausea without vomiting. On objective examination, Dr. O'Shaughnessy observed no acute distress, "mild decreased range of motion" of the cervical spine "without precipitation of significant pain, radicular pain, or Lhermitte's sign"; adequate range of motion of the lumbar spine without radicular pain and no point tenderness; normal extremity strength; decreased sensation in the hands and feet; "unusual" gait "lean[ing] to the right and elevat[ing] her left hip as she walks" with "mildly widened base" and negative Romberg test; ability to "heel and toe walk with assistance for balance"; and some abnormal results with reflexes ("biceps triceps 2/4, patella 3+ on the right 2/4 on the left, Achilles 1-2 over 4 bilaterally[,] Plantar responses were flexor bilaterally[,] Hoffman reflexes are absent bilaterally"). Dr.

O'Shaughnessy ordered an MRI[5] of the brain and cervical spine; ordered an EMG[6] "of both lower extremities and 1 upper extremity to look for neuropathy, carpal tunnel syndrome, [and] cervical or lumbar radiculopathy"; and prescribed gabapentin (to help with both her pain and migraines).

On April 27, 2022, she met with Dr. Lederman to obtain her sleep study results and said she was "happy with" her neurology appointment and had "improved some" overall (referring to migraines, pain, and/or mental health). AR 1618. Dr. Lederman refilled tramadol. AR 1628-29

On May 9, 2022, Plaintiff obtained cervical spine and brain MRIs. AR 1644-46. The cervical spine MRI showed "minimal degenerative changes at the cervical spine," "no spinal canal narrowing," "neural foraminal narrowing mild on the right at C3-C4 and minimal on the left at C5-C6," and "straightening with loss of normal cervical lordosis, most often related to patient positioning versus muscle spasm." The brain MRI was normal. On June 14, 2022, Plaintiff underwent an MRI of the lumbar spine, which was also normal. AR 1694.

On June 20, 2022, Plaintiff attended physical therapy for neck and low back pain. AR 1734-38. She reported that she "felt fine" prior to 2015-2016, "then her health started to decline." She said she started noticing pain with movement in 2015-2016 that was not localized to any one spot, that she experienced tingling in her extremities as far back as 2016, and that she started getting migraines in late 2016. She reported she currently felt pain at night and upon waking up in the morning. She said she could not sit, stand, or lie down for "too long" without hurting (her legs and back with sitting; her feet with standing). The note reflects her "left leg is off balance and she wobbles when she walks." She reported migraines four to five times a day lasting five to six hours.

[5] Magnetic resonance imaging.

[6] Electromyography.

She said tramadol "helped some," including slowing down her migraines. The physical therapist observed pain with transitional movements, abnormal gait,[7] good sitting balance, poor standing balance due to leg weakness, mostly 4-/5 strength in the hip and legs, hyperreflexia on the patella tendon and ankle clonus with the right worse than left, and right straight leg raise "result[ing] in onset of muscle tone in the leg with hip ext[ension] rotation with leg raise past 45 degrees." The physical therapist concluded "clinical findings suggest[ed] . . . bilateral [leg] weakness, pain in the lumbar spine, chronic migraines of unknown origin, abnormal tone throughout the [legs], gait abnormalities and decreased safety with functional mobility." The treatment note indicates "[Patient] education with use of a Rolator walker to assist with stability during the gait cycle."

On November 10, 2022, Dr. Lederman completed a form for Plaintiff's disability application. AR 1860-61. He noted her mental-health diagnoses, as well as obesity and chronic pain syndrome. He indicated she "require[d] continuous in-home care by a family member or other caregiver," handwriting that "she needs emotional support." He indicated Plaintiff could not work due to "behavioral limitations" and "psychiatric diagnoses" (not her physical conditions).

On November 21, 2022, Plaintiff attended physical therapy. AR 1868-72. Plaintiff reported back pain that had gradually been getting worse over the last few years, as well as pain and tingling in the back of her legs with ambulation. She reported feeling unsteady when walking but denied falling in the past year. The treatment note reflects Plaintiff's sitting was "not limited," but she could only tolerate standing "a few minutes due [to] pain and tingling down legs" and walking "household distances only, up to 100

[7] "High stepping, decreased [dorsiflexion] with [patient] walking flat foot; does not heel strike or push off the toes during the gait cycle; decreased stance time on the [right leg]; walks on the outside of the [right] foot; does not fully extend either knee . . . maintaining at least 20 degrees of flexion during gait; [l]egs shake or bounce during weight bearing." AR 1737 (emphasis omitted).

feet, due to pain and tingling down legs." It took her 45 seconds to complete the TUG test[8] (more than 12 seconds indicates a high risk for falls), and she performed 4 repetitions during the 30-second chair test,[9] which also indicated a high risk for falls. Other objective observations included Plaintiff's ambulation without a walker showing "antalgic gait of [right leg]," "reach[ing] for nearby objects for support," and "demonstrat[ing] a significant [loss of balance];" good sitting balance and bad standing balance; normal leg range of motion; leg strength 3+ to 4 out of 5; and tenderness to touch in the low back. The physical therapist noted the clinical findings were suggestive of "back pain with radiculopathy and weakness of [right lower extremity]."

On November 22, 2022, Plaintiff met with Dr. Lederman. AR 1866-68. She reported feeling unsteady on her feet and falling to the right side. She noted taking only small doses of gabapentin, lorazepam, and amitriptyline once daily, and Dr. Lederman noted agreement in working to "get her medication list down." He instructed her to stop taking those medications immediately, then one week later, start tapering off the tramadol as tolerated.

On December 13, 2022, Plaintiff returned to Dr. Lederman. AR 1885-87. She reported she had stopped all pain medications (she remained on Cymbalta and other mental-health medications), her pain was "in very good control," and she was "more active." "She attribute[d] her improved pain control to marijuana." She reported "assisting her husband in some work" and "carrying heavier loads," which might cause

---

[8] This test assesses mobility by seeing how long it takes a person to rise from an armchair, walk ten feet, then return and sit back down in the chair (using an assistive device if needed). CDC, **Timed Up and Go (TUG)**, https://www.cdc.gov/steadi/media/pdfs/STEADI-Assessment-TUG-508.pdf (last visited Aug. 31, 2026).

[9] "This test measures the number of times an individual can stand from a chair with no assistance in 30 seconds. This test is used to assess functional lower body strength." American Physical Therapy Association, **30-Second Chair Stand Test**, https://www.apta.org/patient-care/evidence-based-practice-resources/test-measures/30-second-chair-stand-test (last visited Aug. 31, 2026).

her back to hurt, but then she "lighten[s] her efforts and [the] pain resolves." Dr. Lederman noted he was "not at all disappointed for her to be using a small amount of marijuana every evening after the children are asleep."

The Social Security Administration denied Plaintiff's disability claim on initial review in July 2022 and on reconsideration in January 2023. AR 142-63. As part of those reviews, state agency medical consultants reviewed the treatment records and determined Plaintiff's RFC, recommending she avoid exposure to noise. AR 147-49, 158-60. On reconsideration, the consultant noted a walker had recently been ordered for Plaintiff's gait dysfunction, but medical visits thereafter made no mention of its use. *Id.*

On January 26, 2023, Plaintiff visited Dr. Lederman. AR 1911-14. She reported "doing very well" since stopping many of her medications and replacing them with daily marijuana. She denied "significant pain concerns" and noted "she [wa]s able to clean her house." On objective examination, Dr. Lederman observed normal gait, and 5/5 strength and intact sensation in the arms and legs. Dr. Lederman noted her headaches were "controlled with conservative measures and over-the-counter analgesics." He declined to make any changes to her medications since she was "doing well" and instructed her to follow up in six months.

On April 9, 2023, Plaintiff presented to the ER by wheelchair. AR 1905-08. She stated she had stopped all her medications (including her mental-health medications) to self-treat with marijuana instead and was initially feeling "very well." She could no longer afford marijuana, and her chronic pain and right arm and leg weakness had returned, which she had been treating sporadically with a few of her leftover medications the last couple days. She stated she felt anxious with numbness down her face and right side; she denied pain. She also noted her significant other had recently started a new job working nights, increasing her stress in caring for their children. Plaintiff was treated for anxiety and discharged with a recommendation that she restart her medications.

In late April 2023, Plaintiff reported to the Social Security Administration worsening social anxiety, sleep, pain, and migraines. AR 433.

On May 9, 2023, Plaintiff met with Dr. Lederman to follow up after the ER. AR 1940-41. She stated she had resumed two of her mental-health medications (Depakote and Cymbalta), as well as her twice daily THC dose, and was "feeling well." Dr. Lederman instructed that it was important she continue taking these medications and THC.

On July 23, 2023, Plaintiff presented to the ER by ambulance after suffering a panic attack at home; Dr. Lederman happened to be working in the ER that day. AR 1953-57. His treatment note reflects that Plaintiff had been taking "a relatively low-dose of smoked leaf marijuana twice daily," which "was controlling her pain and seem[ed] to have benefit with her mood," but after four months, "she lost her connection." Since then, her pain and anxiety had been gradually worsening. On objective examination, Dr. Lederman noted normal neck range of motion. He provided buspirone for anxiety and noted he would follow up with her at her upcoming appointment.

On July 25, 2023, Plaintiff had an appointment with Dr. Lederman. AR 1963-66. During the review of systems, she admitted to aches all over and improved anxiety since starting buspirone. Her medication list also included Depakote, Cymbalta, and sumatriptan (Imitrex), a migraine abortive medication. Dr. Lederman noted he supported her obtaining marijuana "and using it in a controlled manner to help manage her psychiatric concerns." Dr. Lederman filled out a physical RFC form on Plaintiff's behalf. AR 1972-75. He wrote that her symptoms included pain all over, including back, extremities, joints, and muscles, made worse with movement and exertion. Objective signs included morbid obesity and numerous tender points. He indicated she could walk one block without hurting and sit and stand five minutes each before needing to shift positions. He said she could rarely lift items weighing less than ten pounds and could never lift ten pounds or more. He checked a box indicating she had limitations

with reaching, handling, or fingering, explaining she occasionally dropped things. He opined she would need constant unscheduled breaks and would miss more than four days of work a month.

The ALJ held a hearing in August 2023, at which Plaintiff and vocational expert (VE) Randall Harding testified. AR 64-65. Plaintiff testified that her "body pain" made it difficult for her to sit, stand, or walk for longer than six minutes at a time. AR 68-80. She said doctors did not know the cause of her pain. She denied driving, grocery shopping, cleaning, or cooking due to pain. She noted her significant other's brother lived with them to provide additional support and helped with laundry and the kids. She estimated "the guys" cared for the four kids, ages seven and under, 50-60% of the time.

The ALJ issued a written decision (AR 168-184), which the Appeals Council ultimately reversed and remanded (AR 192-94). One of the Appeals Council's directives was to obtain additional VE evidence on whether the addresser position "is performed with more modern tools or processes," rather than by handwriting or typewriting addresses. AR 193.

On August 22, 2023, Plaintiff followed up with Dr. Lederman. AR 1976-78. He noted at her last appointment, she had been decompensating with frequent panic attacks and anger management issues. Since restarting her medications and resuming the ability to obtain marijuana, her mood had stabilized and "functioning and home improved."

On September 3, 2023, Dr. Lederman filled out a mental RFC form on behalf of Plaintiff. AR 1967-71. He checked a box indicating her "signs and symptoms" included a "history of multiple physical symptoms (for which there are no organic findings) of several years duration beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly."

On January 2, 2024, at Dr. Lederman's office for a sore throat, the provider observed on objective examination normal musculoskeletal range of motion. AR 1985.

On May 7, 2024, Plaintiff met with Dr. Lederman for her annual wellness exam. AR 1993-2000. She reported issues with mood. She also complained of "pain all over, treat[ed] with Tylenol and relatively light use of daily marijuana." On objective examination, Dr. Lederman observed "relatively normal" gait, as well as symmetric strength and intact sensation in her upper and lower extremities. Dr. Lederman's assessment noted she "has had a poor response to pain medications other than Tylenol combined with marijuana."

On May 28, 2024, Plaintiff "present[ed] ambulatory to the [ER]" with left-sided numbness and tingling that had started that day (in addition to chronic right-leg numbness and tingling). AR 2004-11. She reported she had been putting more weight on her left side when walking recently. She said she was "supposed to be using a walker but does not have [one]." When she had called the clinic about her symptoms, they instructed her to go to the ER. She denied low back pain but did admit to "bilateral buttock pain and left sciatic pain." She also reported suffering migraines and "having a bit of a headache today." On objective examination, she was observed in no acute distress, with "some palpable tenderness over the left sciatic notch," "no signs of radiculopathy," negative straight leg test, no weakness, 5/5 strength in hip flexion and feet dorsiflexion and plantarflexion, no sensory or motor deficits, and equal strength in the upper and lower extremities. The ER providers gave her pain medications and then discharged her.

On June 11, 2024, Plaintiff met with a nurse practitioner at a family medicine practice. AR 2014-17. She reported chronic pain in her arms and back, as well as chronic migraines, including a current headache (rating both her arm and head pain 7/10 on the pain scale). She said "when she ha[d] a migraine, . . . she could have [three a day] that last[ed] [two] hours apiece." She reported stopping her pain medications (Imitrex, gabapentin) to treat her chronic pain with marijuana instead, but she had stopped smoking marijuana in the last week "due to fear of legal problems." "She frequently mention[ed] narcotic pain medication for her migraines [and] chronic pain syndrome,"

but the provider advised her that narcotics were not recommended to treat chronic pain. The provider noted Plaintiff was in a manic state, and it was difficult to follow her pain concerns due to her mental status. The provider informed her of a "facility where she may legally obtain medical marijuana." The provider renewed Imitrex, recommended discussing gabapentin with neurology, and instructed her to follow up with Dr. Lederman.

On July 30, 2024, Plaintiff had an appointment with Dr. Lederman. AR 2018-21. She reported "multiple pain issues which come and go, likewise paresthesias, specifically right side numbness affecting her gait." Dr. Lederman increased the dosage of one of her psychiatric medications (Depakote).

On October 13, 2024, Dr. Lederman completed another physical RFC form. AR 5176-80. He stated symptoms included pain in the low back, hip, and foot; severe headaches; and relatively frequent sinus and chest infections. He stated she could sit and stand for ten minutes at a time due to back pain and for a total of less than two hours a day. He indicated she would need to shift positions between sitting, standing, and lying down. He estimated she would need frequent twenty-minute breaks due to pain, paresthesias, and numbness. He said when engaging in occasional standing or walking, she should use a walker due to imbalance, but acknowledged she did not have one. He indicated she could occasionally lift lightweight objects (less than ten pounds) and rarely lift twenty-pound objects. He checked a box indicating difficulties with reaching, handling, or fingering, writing that she was "always dropping things." He estimated she would miss more than four days of work a month. Dr. Lederman noted he had not seen Plaintiff since July. He also completed a mental RFC form. AR 5181-86.

The ALJ held a second hearing in October 2024 (AR 84-85), at which Plaintiff and VE Vanessa May testified. AR 84-85. Plaintiff testified that her headaches had worsened since the last hearing, noting she had to resume taking sumatriptan because her migraines had been getting bad again. AR 89-101. She reported suffering a headache

two to three times a week. She said her chronic pain (in her back, hips, legs, and feet) was about the same and she could not stand for more than five minutes. She reported falling a month ago due to right-sided numbness after "step[ping] too much." She said that she used a walker for longer distances outside of the house, like when shopping at a big box store. She estimated she obtained the walker six to eight months ago from her significant other when he had Covid. She said that her significant other had recently dropped his work hours to an "as needed" basis to be around to help more. She testified that she could not get out of bed one day the prior week because her back and head hurt so much, then estimated three days a week on average where she could not get out of bed, whether due to physical or mental issues. She estimated that she spent twenty-one hours a day lying down.

The ALJ issued a written opinion on December 12, 2024, following the five-step process outlined in the regulations[10] to determine whether Plaintiff was disabled. AR 28-44. The ALJ found Plaintiff suffered from the following severe impairments: migraines, degenerative disc disease of the cervical spine, chronic pain syndrome, asthma, obesity, anxiety, and depression. AR 31. At step three, the ALJ found Plaintiff's impairments did not meet or medically equal a listing without explicitly comparing her migraine headaches to any listing. AR 31-33. To aid in steps four and five, the ALJ determined Plaintiff's RFC[11]:

[10] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." ***Grindley v. Kijakazi***, 9 F.4th 622, 628 (8th Cir. 2021) (quoting ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. § 416.920(a)(4)**. The claimant bears the burden of persuasion to prove disability. ***Goff***, 421 F.3d at 790.

[11] RFC means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019).

> [T]he claimant has the [RFC] to perform light work . . . except with the ability to stand or walk for 4 out of 8 hours . . . ; with the ability to occasionally climb ramps and stairs, balance, stoop, kneel, crouch, but never climb ladders, ropes, or scaffolds, or crawl; should work in an environment with a moderate noise intensity level or less; with the need to avoid exposure to workplace hazards; and is limited to simple routine tasks, with the ability to occasionally interact with co-workers and supervisors, but with no work-related interaction with the public.

AR 33.[12] Relying on VE May's testimony, the ALJ found a significant number of jobs existed in the national economy Plaintiff could perform: ticket counter (DOT § 219.587-010, 8,500 positions nationally), addresser (DOT § 209.587-010, 1,900 positions nationally), and document preparer (DOT § 249.587-018, 14,000 positions nationally). AR 43, 102-03. At the first hearing, in response to the same hypothetical, VE Harding had similarly identified the addresser job, which he estimated at 2,000 positions nationally; as well as stating Plaintiff could work in two assembly positions with a combined 4,000 positions available nationwide. AR 81. The ALJ found Plaintiff was not disabled from her filing date of January 18, 2022, through December 12, 2024, the date of the decision. AR 44.

The Appeals Council denied Plaintiff's request for review on April 25, 2025 (AR 1-3), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[13] Plaintiff filed a timely complaint in this court (Doc. 6).[14] The parties briefed the issues (Docs. 20-22) and the Honorable C.J. Williams, Chief District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

---

[12] This is the same RFC the ALJ found in his prior October 2023 decision. AR 176.

[13] *See* **20 C.F.R. § 416.1481**.

[14] *See* **20 C.F.R. § 422.210(c)**.

## *II. DISCUSSION*

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[15] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[16] The court "do[es] not reweigh the evidence or review the factual record de novo."[17] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[18]

Plaintiff argues that the ALJ erred at step three by failing to consider whether Plaintiff's migraines equaled Listing 11.02B. In determining RFC, she contends the ALJ should have included limitations related to light sensitivity and use of a walker. And she argues that the ALJ's step-five finding is not supported by substantial evidence because the ALJ relied on obsolete jobs without regional job numbers.

### *A. Listing 11.02B*

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1.[19] "[A claimant's] impairment[] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."[20] If a claimant's impairment is not

---

[15] ***Grindley***, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[16] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007).

[17] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

[18] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

[19] **20 C.F.R. § 416.920(a)(4)(iii)**.

[20] **20 C.F.R. § 416.925(c)(3)** (citation omitted).

described in the listings (like migraines), the Social Security Administration compares the claimant's "findings with those for closely analogous listed impairments"; "[i]f the findings related to [the claimant's] impairment[] are at least of equal medical significance to those of a listed impairment," it equals the listing and the claimant is disabled.[21]

The ALJ analyzed listings pertaining to musculoskeletal, joint, respiratory, and mental impairments, but did not explicitly compare Plaintiff's migraines to any listing. AR 31-33. Guidance from the Social Security Administration provides that Listing 11.02, governing dyscognitive seizures (epilepsy), "is the most closely analogous listed impairment for" a headache impairment.[22] Plaintiff argues that the ALJ erred by failing to evaluate her migraines under Listing 11.02B. But "[t]he ALJ's failure to identify and analyze the appropriate listing, although error, may not by itself require reversal so long as the record otherwise supports the ALJ's overall conclusion."[23]

Listing 11.02B "requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment."[24]

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, [the Social Security Administration] consider[s]: A detailed description from [a medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used

---

[21] **20 C.F.R. § 416.926(b)(2)**.

[22] **Social Security Ruling (SSR) 19-4p**, 84 Fed. Reg. 44667, 44671 (Aug. 26, 2019).

[23] ***Brown v. Colvin***, 825 F.3d 936, 940 (8th Cir. 2016).

[24] **SSR 19-4p**, 84 Fed. Reg. at 44671; *see also* **20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.00H(1)(b), 11.00H(4), 11.02B** (defining dyscognitive seizures as involving "alteration of consciousness without convulsions or loss of muscle control," with "blank staring, change of facial expression, [or] automatisms[] such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances"; and noting that in evaluating the frequency of seizures, the Social Security Administration considers "adherence to prescribed treatment" and "count[s] multiple seizures occurring in a 24-hour period as one seizure").

> for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).[25]

Plaintiff argues that her migraines "could plausibly equal Listing 11.02B." She argues that the record establishes that she suffered migraines at least two times a week (based on a physical therapy treatment record from June 2022 and her hearing testimony in October 2024). She points to a neurology treatment note from April 2022 reflecting migraine symptoms of blurred vision, light and noise sensitivity, and nausea. Plaintiff also argues that she has tried "multiple medications" to treat her migraines, including gabapentin, amitriptyline, and sumatriptan.

Although the ALJ acknowledged Plaintiff's testimony that she suffered "2 or 3 migraines per week," I disagree with Plaintiff that the ALJ fully credited this testimony. *See* AR 34-36. In determining her RFC, the ALJ noted the relatively few instances of treatment for headaches and that they seemed to be under control for the most part. *Id.* Treatment records reflect that Plaintiff complained of frequent headaches and migraines as early as 2017 (sometimes caused by taking Tylenol and ibuprofen too frequently, as well as from drinking soda), but she also went long periods without mentioning them. When she filed for disability in January 2022, she did not list headaches as a reason for disability. Neither did she mention headaches in her function report in early April 2022. In mid-April 2022, she called Dr. Lederman to complain about migraines, and he prescribed amitriptyline as a daily preventative medication and referred her to neurology. In late April 2022, she told the neurologist that she suffered from daily headaches with blurred vision at times, light and noise sensitivity, and nausea; and she was prescribed

[25] **SSR 19-4p**, 84 Fed. Reg. at 44671.

gabapentin. At a physical therapy appointment in June 2022, she reported suffering migraines since 2016, four to five times a day lasting five to six hours, "helped some" with tramadol. She began tapering off her pain and migraine medications in November 2022, and by mid-December, had stopped all such medications and was using marijuana instead. In January 2023, she reported her headaches were under good control with over-the-counter medications. Treatment records in 2023 do not reflect that she complained of migraines or headaches, and she did not mention them at the hearing in August 2023. In May 2024, while at the ER for back pain and numbness, she said she had "a little bit of a headache." In June 2024, she complained of chronic migraines and a current headache; she said on a "migraine day," she might have three migraines a day lasting two hours (but did not say how often these days occurred); and she received a prescription for sumatriptan, an abortive migraine medication. At the ALJ hearing in October 2024, she testified to suffering a headache two to three times a week.

Overall, here, the record does not support that Plaintiff suffered migraines equal in severity and frequency to Listing 11.02B. Indeed, for most of the relevant time period, Plaintiff's headaches did not need prescription treatment at all. In addition, there is no evidence of the symptoms caused by Plaintiff's migraines when she was taking her medications (Plaintiff relies on the April 2022 neurology note, but she had not been taking amitriptyline for very long at that point, and she had not yet started gabapentin).

I recommend finding that any error in failing to explicitly consider Listing 11.02B was harmless.

***B. Light Sensitivity***

Plaintiff argues that the ALJ erred by including a limitation in her RFC related to noise sensitivity but not light sensitivity. During her neurology appointment in April 2022, Plaintiff complained of light and noise sensitivity with migraines. No other treatment records during the relevant time period reflect these symptoms, nor did Plaintiff

testify to suffering from light or noise sensitivity. Nevertheless, in determining Plaintiff's RFC, the ALJ limited Plaintiff's exposure to noise. Plaintiff thus argues that the ALJ must have credited her reported symptoms in April 2022 and should have similarly limited her exposure to lights (or else explained the failure to do so).

I agree with the Commissioner that rather than crediting Plaintiff's one-time report of her symptoms, the ALJ credited the state agency consultants' medical opinions. *See* AR 39. The state agency consultants recommended limiting Plaintiff's exposure to noise but not light. As outlined in the preceding section, Plaintiff received limited treatment for migraines during the relevant time period and went long periods without complaining of headaches.

I recommend finding that the ALJ did not err by failing to limit Plaintiff's exposure to light in the RFC.

### *C. Use of a Walker*

Plaintiff argues that the ALJ erred in failing to include in the RFC her need to use a walker. Guidance from the Social Security Administration provides:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).[26]

"A prescription (or the lack of a prescription) for an assistive device is not necessarily dispositive of the presence or absence of medical necessity, but it is important to the ALJ's analysis."[27]

---

[26] **SSR 96-9p**, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

[27] ***Patricia M. v. Saul***, No. 18-cv-3462, 2020 WL 3633218, at *7 (D. Minn. Feb. 5, 2020) (citations omitted) (first citing ***Staples v. Astrue***, 329 F. App'x 189, 191-92 (10th Cir. 2009);

Here, the ALJ acknowledged that "some treatment notes indicate the use of a walker was recommended" but found "no evidence [a walker wa]s medically required." AR 31. The treatment notes show that Plaintiff reported back and leg pain throughout early 2022. But the ALJ noted treatment records indicating Plaintiff's gait improved, as well as no medical records reflecting that Plaintiff actually used a walker.

Substantial evidence supports the ALJ's determination. A June 2022 physical therapy note reflects that Plaintiff was "educat[ed] with use of a Rolator walker to assist with stability during the gait cycle." But as the ALJ noted, treatment notes do not reflect that Plaintiff used a walker thereafter. In November 2022, a provider explicitly noted she did not use a walker (and had antalgic gait). In December 2022 and January 2023, she reported doing well after stopping her medications and self-treating with marijuana, was able to carry heavy loads around the house, and had a normal gait. In April 2023, she used a wheelchair at the ER during a panic attack when she could no longer afford marijuana, but by the next month, she reported doing well (and using marijuana again). In August 2023, a treatment record reflects her functioning had improved. In early May 2024, she was observed to have a normal gait. In late May 2024, she went to the ER with pain and numbness and said she was supposed to be using a walker but did not have one. She also reported pain in July 2024 after being off marijuana and her medications for a week. At the hearing in October 2024, she testified that for the past six to eight months, she had been using a walker when out of the house that her significant other had obtained when he had Covid.

Plaintiff argues that the June 2022 physical therapy note prescribing a walker plus additional notations of gait abnormalities support that a walker was medically required. But the ALJ could rely on Plaintiff's improvement and lack of documentation in the

---

then citing ***Toland v. Colvin***, 761 F.3d 931, 936 (8th Cir. 2014)), *report and recommendation adopted sub nom.* ***McArdell v. Saul***, 2020 WL 1951748 (Apr. 23, 2020).

treatment notes of actual walker usage.[28] In addition, here, there is no medical evidence of the circumstances under which Plaintiff would need to use a walker (e.g., to stand? to walk distances of a certain length? etc.).[29]

I recommend finding that the ALJ did not err by failing to include the need for a walker in Plaintiff's RFC.

### *D. Significant Number of Jobs*

At step five, "the burden shifts to the Commissioner to establish that [claimant] maintains the [RFC] to perform a significant number of jobs within the national economy."[30] "The [ALJ] may rely on a vocational expert's" testimony "to show that jobs that a person with the claimant's RFC can perform exist in significant numbers."[31]

Here, the ALJ relied on testimony from VE May. AR 43, 102-03. VE May's resume indicates that she has a Master's Degree in Vocational Rehabilitation Counseling and Personnel Services; that she worked adjudicating Social Security claims at the state agency level for twenty years, then determined Social Security disability for a private

---

[28] *See, e.g.*, ***Tanya S. v. O'Malley***, No. 23-CV-1416, 2024 WL 3858155, at *9 (D. Minn. Aug. 19, 2024) ("[T]he fact that [her provider] had not seen her walker is evidence that a walker was not medically necessary.").

[29] *See* ***Howze v. Barnhart***, 53 F. App'x 218, 222 (3d Cir. 2002) (insufficient evidence of medical necessity based on treatment record's reference "to a 'script' for a cane"; doctor's checkbox form indicating "hand-held assistive device medically required for ambulation"; and "multiple references to the fact that [claimant] uses a cane"; since SSR 96-9p requires "medical documentation . . . describing the circumstances for which [the assistive device] is needed"); ***Edwards v. Berryhill***, No. 17-CV-05092, 2019 WL 1320314, at *15 (D.S.D. Mar. 22, 2019) (insufficient evidence of medical necessity despite "numerous references to [claimant's] use of crutches, canes, and walkers," when only evidence of "prescription" was a "referral[] to physical therapy for the issuance of . . . . a replacement . . . crutch" and again "for a walker after [claimant] complained of falling," which did not "describe[] the circumstances for which it is needed").

[30] ***Pearsall v. Massanari***, 274 F.3d 1211, 1219 (8th Cir. 2001).

[31] ***Guilliams v. Barnhart***, 393 F.3d 798, 804 (8th Cir. 2005).

company for four years; spent fifteen years in the vocational rehabilitation field helping injured individuals find work; and has served as a vocational expert for the Social Security Administration for more than twenty years. AR 493-94. VE May testified that Plaintiff could work as a ticket counter, addresser, or document preparer, and provided the number of those positions available nationally. AR 43, 102-03.

Plaintiff argues that the ALJ erred in relying on VE May's testimony because the Dictionary of Occupational Titles (DOT) descriptions of these jobs show they are obsolete. The DOT has not been updated since 1991, and some of the job descriptions are even older; nevertheless, the Social Security Administration requires VEs to testify in a manner that is consistent with the DOT.[32] The DOT describes the document preparer job as "prepar[ing] documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices."[33] It describes the addresser as "[a]ddress[ing] by hand or typewriter[] envelopes, cards, advertising literature, packages, and similar items for mailing," as well as maybe "sort[ing] mail."[34] A ticket counter "[c]ounts and records number of parimutel tickets cashed at race track to verify records of cashiers[, c]ompares totals with entries on daily balance sheet," verifies the "validity of tickets" by comparing them with a sample or examining them "under fluorescent light," and "[r]eports discrepancies."[35] Plaintiff argues that document preparers for microfiche have been replaced with digital scanning and cloud-based storage, that addressers using typewriters have been replaced with computer databases that automatically generate printed mailing labels, and that

---

[32] *See* ***Stanton v. Comm'r, Soc. Sec. Admin.***, 899 F.3d 555, 558 (8th Cir. 2018) (VEs must explain any conflicts with the DOT); ***Medved v. Kijakazi***, 855 F. App'x 311 (8th Cir. 2021) (per curiam) (DOT not updated since 1991).

[33] **DOT § 249.587-018**.

[34] ***Id.*** **§ 209.587-010**.

[35] ***Id.*** **§ 219.587-010**.

manually counting tickets and checking their validity has been replaced with computerized systems.

At the time of the ALJ's decision, the Social Security Administration had issued an Emergency Message noting that "[s]ome courts have questioned whether some occupations continue to be performed in the manner that they are described in the DOT."[36] Thus, the Social Security Administration instructed that an ALJ may not rely on the positions of addresser or document preparer "without additional evidence from a . . . VE supporting the adjudicator's conclusion that, as the occupation is currently performed[ i]ts requirements are consistent with the individual's RFC, and it exists in the national economy in numbers that alone, or in combination with work in other cited occupations, are significant."[37] Plaintiff argues that courts have also found the ticket counter position obsolete, but her cited cases are distinguishable.[38]

At the hearing, the ALJ asked the VE whether any of the identified jobs had "significantly changed from a technological standpoint since the creation of the [DOT]." AR 102. The VE responded:

> In my experience, no. I mean, Ticket Counter is counting . . . pieces of paper, whether it's a ticket or a sheet of paper. The Addresser, the only thing that I would say would be different is you're not using a typewriter, but if you were using a typewriter before and it switched to a computer, the keyboard is the same. So, that would not be any different if that's how the addressing was getting done. The Document Preparer, that's basically just

---

[36] Social Security Administration, **EM-24027** (June 22, 2024),

https://secure.ssa.gov/apps10/referencearchive.nsf/links/06212024022159PM.

The revised message currently in place contains largely the same guidance. Social Security Administration, **EM-24027 REV** (Jan. 6, 2026),

https://secure.ssa.gov/apps10/reference.nsf/links/01062025092030AM.

[37] **EM-24027**, *supra* note 36.

[38] ***Ragsdale v. Saul***, No. 18-CV-946, 2019 WL 2991945, at *6 (E.D. Wis. July 8, 2019) (claimant argued obsoleteness but court found argument forfeited, as claimant had not challenged basis for VE testimony at the hearing).

> someone who's taking a stack of papers that are going to be scanned by someone else and cleaning those papers up, meaning taking paperclips off, taking staples out, taking tabs off, things like that. So, no, in my experience, those jobs have not changed.

AR 102-03. The VE denied that she had "observed th[e]se jobs being performed or done labor market studies" but reiterated that the jobs were "still being done," just in "very small number." AR 104. Plaintiff's attorney asked whether the VE obtained her job numbers from the DOT or "adjusted as it's done now," and the VE explained "that the Bureau is identifying them as being done, and it's correlated with the DOT number[, s]o, I guess it is both."

I recommend finding that the ALJ did not err in relying on the document preparer, addresser, or ticket counter positions. VE May had decades of experience[39] and explained why she believed the three positions still existed in small number. This is not a case where the VE's numbers were patently suspect.[40] And district courts in this circuit have

---

[39] *Cf.* ***Biestek v. Berryhill***, 587 U.S. 97, 105 (2019) (noting relevance of VE's "professional qualifications and many years' experience" when determining whether substantial evidence supports ALJ's step-five findings in reliance on VE's job numbers).

[40] In *Dearth v. Berryhill*, No. 16-CV-487, 2018 WL 1225045, at *4-5 (N.D. Ind. Mar. 9, 2018), a case relied upon by Plaintiff, the court questioned the "VE's testimony that the parimutuel-ticket checker job still exist[s] and . . . that they employ 800 full-time workers in the state" because there were "just two horse racing tracks that feature parimutuel betting" in the state. The court therefore suspected the VE used an "unacceptably crude" method to determine the number of available jobs and remanded for the ALJ to "specifically ascertain the source of the VE's opinion." ***Id.*** at *4-5. Here, VE May provided nationwide numbers obtained from the "Bureau," and nothing suggests a crude methodology. Plaintiff also points to a case where the VE identified 1,100 ticket checker jobs available for the claimant (here, the VE identified 8,500 jobs), but in that case, the claimant had additional limitations such as being off task 5% of the time that might have further eroded the occupational base. ***See Cody M. v. Saul***, No. 19-cv-01181, 2020 WL 1149596, at *2, *4 (S.D. Ind. Mar. 9, 2020). In addition, VE May's numbers for the addresser position closely aligned with the VE's testimony from the prior hearing (1,900 versus 2,000 positions nationwide), lending further credibility to VE May. AR 81, 102-03.

largely rejected obsoleteness arguments.[41]

Plaintiff also argues that the ALJ erred in failing to obtain regional job numbers. Plaintiff relies on cases from the District of South Dakota. This court, however, has previously declined to follow these cases (as have other district courts in the Eighth Circuit) and "held that the Commissioner may meet his step-five burden through national

---

[41] ***Alicia P. v. Bisignano***, No. 25-cv-3168, 2026 WL 1540552, at *7-8 (D. Minn. May 8, 2026) (recognizing that Social Security guidance does not establish "[t]he job of 'document preparer' is . . . fundamentally obsolete" and upholding ALJ's reliance on VE's testimony when the claimant "raised no objection to the VE's testimony during the hearing"), *report and recommendation adopted,* 2026 WL 1539466 (June 1, 2026) (clear-error review); ***Elizabeth M. v. Bisignano***, No. 25-cv-2550, 2026 WL 686783, at *4–5 (D. Minn. Mar. 11, 2026) (substantial evidence supported ALJ's finding that 15,000 document preparer jobs existed nationwide when VE explained some jobs now used a scanner rather than microfiche and VE listed three databases she relied on for numbers); ***Mindy S. v. Kijakazi***, No. 21-CV-5008, 2022 WL 2905739, at *10 (D. Neb. July 22, 2022) (upholding ALJ's reliance on VE testimony that 15,000 document preparer positions existed nationwide against argument the position was obsolete); ***Wainscott v. Kijakazi***, No. 21-cv-5119, 2022 WL 1310158, at *2 (W.D. Ark. May 2, 2022) (rejecting argument that ALJ erred in relying on document preparer job "as . . . obsolete" when plaintiff "did not question the VE at the hearing about the foundation for her testimony"); ***Ford v. Berryhill***, No. 17-CV-00328, 2018 WL 1040094, at *3 (E.D. Ark. Feb. 23, 2018) (rejecting argument that document preparer position is obsolete because job does not have to be "identical to" DOT description and claimant did not challenge VE testimony at the hearing), *report and recommendation adopted,* 2018 WL 2024620 (May 1, 2018); ***Peters v. Berryhill***, No. 16-CV-1342, 2018 WL 1858159, at *4 (E.D. Mo. Apr. 18, 2018) (rejecting argument that document preparer and addresser job are obsolete) ; ***Reinhart v. Astrue***, No. 10CV00236, 2012 WL 811340, at *9 (E.D. Ark. Mar. 12, 2012) (rejecting argument that document preparer job is obsolete); *see also* ***Gallo v. Comm'r of Soc. Sec. Admin.***, 449 F. App'x 648, 650 (9th Cir. 2011) ("Although the description in the [DOT] of the 'Addresser' job contains a seemingly antiquated reference to typewriters, the ALJ was nonetheless entitled to rely on the VE's testimony that the Addresser job exists in significant numbers in the national economy."); *but see* ***Jennings v. Berryhill***, No. 17-CV-3062, 2018 WL 3656306, at *11-12 (N.D. Iowa Aug. 2, 2018) (holding that the court could not "reach the question of whether the job of addresser . . . is now obsolete" but that the ALJ erred in finding it "exist[ed] in significant numbers in the national economy" based on VE testimony that position involved "stuffing envelopes" and "putting labels on envelopes," because this "more modern explanation" conflicted with the DOT description of the position), *report and recommendation adopted,* 2018 WL 4107911 (Aug. 29, 2018) (clear-error review).

numbers alone."[42] Plaintiff argues her case is distinguishable because of the relatively small number of jobs available nationwide here—just 24,400 total. Plaintiff is correct that regional job numbers may be required when so few national positions exist that the national numbers, standing alone, fail to establish jobs are available in "several regions in the country" (as opposed to a few isolated locations).[43] But as Plaintiff acknowledges, "many courts appear to draw the line between a 'significant' and an insignificant number of jobs in the national economy—without evidence of the number of jobs available locally—at around 20,000 jobs."[44]

Accordingly, I recommend rejecting Plaintiff's argument that the ALJ failed to prove a significant number of jobs existed in the national economy based on the lack of regional job numbers.

## *III. CONCLUSION*

I recommend **affirming** the Commissioner's decision and entering judgment in favor of the Commissioner.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[45] Failure to object to the Report and Recommendation waives the right to *de*

---

[42] ***Sherry L. H. v. O'Malley***, No. 23-CV-4027, 2024 WL 3783575, at *12 & n.46, *15 (N.D. Iowa Aug. 12, 2024) (collecting cases), *report and recommendation adopted,* 2024 WL 4227048 (Sept. 18, 2024) (clear-error review).

[43] *See* ***id.*** at *11-15.

[44] ***Shari B. v. Kijakazi***, No. 22-cv-1539, 2023 WL 6130679, at *8 (D. Minn. Sept. 19, 2023) (collecting cases).

[45] **Fed. R. Civ. P. 72**.

*novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[46]

**DATED** September 2, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

[46] ***See United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).